**In the Interest of J.M.T., a child under seventeen years of age.**

**Greene County Juvenile Office, Petitioner–Respondent,**

**v.**

**A.T., Respondent–Appellant.**

**No. SD 31909.**

Missouri Court of Appeals, Southern District, Division One.

Oct. 17, 2012.

Application for Transfer Denied Nov. 20, 2012.

Motion for Rehearing and Transfer Denied Oct. 26, 2012.

**228**

James R. Sharp, Springfield, MO, for Appellant.

William C. Prince, Springfield, MO, for Respondent.

Margaret Elise Branyan–Barker, for Minor Child.

## NANCY STEFFEN RAHMEYER, J.

A.T. ("Father") appeals the judgment which terminated his parental rights to J.M.T. ("the child") claiming that there are insufficient grounds to support the finding that the child had been abused and/or neglected, that the conditions that led to the child's removal continue to exist, and that it was in the best interest of the child that Father's rights be terminated. Given our standard of review, we must affirm.

■■■ "The judgment in a termination of parental rights case will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law." *In re A.M.C.*, 983 S.W.2d 635, 637 (Mo.App.S.D. 1999). "Due regard is to be given to the trial court's ability to assess the credibility of witnesses." *Id.* We consider the facts and the reasonable inferences therefrom in the light most favorable to the trial court's order. *In re B.L.B.*, 834 S.W.2d 795, 799 (Mo.App. E.D.1992).

The child came into the jurisdiction of the court on November 7, 2007, when Mother voluntarily transferred custody of the child to the Children's Division.[1] Prior to that time, Father had a very limited relationship with the child. The trial court found the following facts to be true concerning Father's actions in relation to his son:

... While [F]ather has only visited the child approximately four times during the past year and has maintained only limited telephonic contact with the child, evidence was presented that [F]ather, through involuntary wage withholding, had provided at least minimal financial support for the child. Furthermore [F]ather continued to articulate an interest in the child. The Court finds that [F]ather did not evince any intent to abandon the child.

...

... Prior to the child's placement in alternative care [F]ather, per the child's report[,] did not have significant contact with him. [F]ather has an extensive criminal history including convictions for burglary in June of 2007; Burglary in June of 2004; stealing; and receiving stolen property. [F]ather served time in the Missouri Department of Corrections.... From the time

---

1. The court also terminated Mother's parental rights and she appeals separately. We describe the evidence concerning Mother only to the extent necessary to address Father's appeal.

custody was taken in 2007 through approximately November of 2008 [F]ather did not visit the child. From November of 2008 through 2010 [F]ather generally maintained visitation with the child supervised either by the caseworker or the foster parents. During the year 2011, [F]ather visited the child only on four occasions although additional visitation would have been available to him and financial assistance in the form of reimbursement for gas money would have been provided to him by the agency. [F]ather's last visit with the juvenile occurred at the foster placement in October of 2011. [F]ather's last phone contact with the child occurred on Christmas 2011. Although [F]ather testified that he called the child on other occasions, he did not leave messages that he had called because he did not like leaving messages on answering machines. [F]ather has not demonstrated the ability to provide for the child's educational or other needs as [F]ather consistently had difficulties in managing his own transportation and other needs.

. . .

[F]ather resided in several different residences in Columbia[,] Missouri[,] and Belton[,] Missouri. Efforts were made to complete [a] home study on his residence but due to his moves and delays in paperwork, that process was slow moving. The home study on [F]ather's residence was subsequently denied. [F]ather, per his service worker[,] currently resides in an appropriate residence that meets minimum community standards.

Visitation has been available to [F]ather. [F]ather's visitation as previously been discussed has been sporadic and inconsistent at best. Within the last year [F]ather has visited with the child approximately four times. [F]ather, within that same period did not maintain consistent phone or other contact with

the child. The Court finds that visitation and phone contact has been available for [F]ather on most occasions if he had only taken the initiative to pursue such contact with his son. A child needs consistency in his life with parents and requires appropriate direction, love and nurturing at all time[s]. It is clear to this court that [F]ather is unwilling or unable to provide such on a consistent basis. An occasional appearance at a football game or just a few visits in the home is insufficient to support a real conviction on the part of father that he wants to be [a] full time parent for his son.

[The child's] counselor, Ms. Hiebsch, testified that [the child] is prescribed medication for ADHD and has aggressive behavior at school and other activities. At times . . . his behavior has been so poor after returning from visits with [Father] that his counselor recommended visits cease. [The child] also has extensive educational needs. He is functioning at a second grade level with his reading while he is actually in the 5th grade. The foster mother was able to obtain a tutor for him at school. The evidence is overwhelming that this child needs structure, consistency, stability and assistance with all of his needs. It is the Court's opinion that based on [F]ather's lack of involvement with his child throughout his life to date, [F]ather would not meet the needs of his son in the future.

[F]ather provided financial support through wage withholding.

[f]ather provided verification of stable employment.

Subsequent to the date of the initial hearing on the petition to termination [sic] of parental rights, [Father was] referred to parenting classes through

Swope Health Services. [F]ather attended only two and one half sessions out of eight.

[F]ather was, subsequent to the date of the initial termination of parental rights[,] referred to counseling at Pathways. [F]ather consistently failed to schedule counseling appointments.

... Having been given an opportunity to participate in services and maintain contact with the child, [F]ather has consistently come up with excuses for not following his treatment plan.

...

... [F]ather has further failed to maintain a consistent parental relationship with the child.

This Court finds that ... [F]ather ... failed to demonstrate the ability to meet the basic needs of the child.

... The minor child's counselor reported that the child was in need of structure, consistency and stability and that he needed to complete his education. The therapist noted that the child's behaviors seem to diminish when he was not visiting [F]ather frequently and at one point recommended that visits cease. The Court has concerns that [F]ather would be unable to see to the educational and other needs of the child as [F]ather consistently demonstrated an inability to take care of his own needs. He has no operable motor vehicle; his license is suspended and [he] has very little money for his own necessities let alone for his son.

...

There was no evidence presented that the [child] did not have some type of attachment to [F]ather. The child's therapist testified that the child appeared to be bonded to his current placement. The child is placed in stable setting where the child's needs are being met.

... The parents have not maintained regular visitation or contact with the child.

... [F]ather, although articulating an interest in the child, has not demonstrated such an interest as evidenced by his failure to regularly visit the child or participate in services.

...

The continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

The inability of the parents to provide proper care, custody and control for the minor child is potentially harmful to the child should the child be returned to that environment.

■ It is clear from the evidence as recited by the court that there was sufficient evidence to support both grounds cited by the court under section 211.447.5(2) and (3).[2] Although the court acknowledged positive behavior on the part of Father such as maintaining acceptable housing at the time of the hearing and attempting to maintain contact with the child, the trial court found that behavior was outweighed by the failure of Father to consistently visit and maintain phone contact even though given the opportunity to do so, and the failure of Father to follow through with counseling and parenting classes. The court was able to assess the sincerity of the effort of Father to actually parent his child.

There is no question that, despite intensive intervention, Father's frequent moves made it difficult to provide services for Father. His parenting plan included completing a parenting course and attending

2. All references to statutes are to RSMo Cum. Supp.2011, unless otherwise specified.

individual and/or family therapy if recommended; however, Father only attended two and a half out of eight sessions of his parenting class and failed to even attend the initial individual therapy session. The treatment plan also included visiting child a minimum of once every two weeks, but Father only visited four times during 2011.[3] Points I and II challenging the finding of substantial evidence that Father abused and/or neglected the child and that Father failed to rectify the conditions that caused the child to be placed under the jurisdiction of the court are denied.

■ Father's third point contends that the trial court abused its discretion because it is not in the best interest of the child to terminate Father's parental rights. Again, the trial court commendably set forth the positives in Father's relationship with the child; however, the negatives outweighed the positives in the trial court's assessment. Although Father contends that his failure to comply with his treatment plan and visit with the child stemmed from financial problems, the trial court noted that Father was given the opportunity to visit more often and communicate by telephone but had failed to take advantage of that opportunity. The trial court noted that Father did not take advantage of seeing the child at the time the child was taken into custody.[4] Although there were periods where Father did visit, during 2011 Father visited the child on only four occasions and, with the exception of a phone call on Christmas, Father's last phone contact with the child was months before the termination hearing.

Of concern on this issue, of course, are the numerous placements that the child has had to endure. The child is now thirteen years old and had been in six different placements by December of 2009; at the end of the 2009–2010 school year, the child was moved yet again because of his behavior issues. Furthermore, Father and the child's relationship had improved since Father became engaged and included unsupervised visits during 2011. Nevertheless, the court noted the struggles of the child when Father promised visits or activities and failed to follow through. As the court noted, with particularity to the child, "[a] child needs consistency in his life with parents and requires appropriate direction, love and nurturing at all time[s]. It is clear to this court that father is unwilling or unable to provide such on a consistent basis." Most importantly, the court was free to consider the negative effects on the child after the visitation. The counselor reported that the child had behavior problems after visiting with Father.[5]

While it is commendable that Father makes the effort to maintain contact on

3. There were other times Father made plans to visit, but then failed to show up.

4. Father's first contact with Children's Services was not until May of 2008. At that time, the child's therapist did not recommend contact between Father and the child until the child could work out his issues in therapy. Phone contact began in November 2008 and the first visit between Father and the child did not occur until February of 2009.

5. When asked where the child's anger stems from, the counselor, Ms. Hiebsch, testified: There appears to be a pattern of his anger outbursts, generally after he's had contact with dad. That's when I started to see more of an aggression behavior. And then he kind of gets calmed down, and then there's another contact with dad and his behaviors will spike again. Again we get him to calm back down again. And he has some challenges with containing that anger that he's feeling. You know, a lot of frustration and a lot of anxiety surrounding on and off again contact, which would be normal for any child that's in that predicament. It appears that that is what I have seen.

some basis, the court did not abuse its discretion in finding that the best interest of the child is to be assimilated into a home that can provide day-to-day support and consistency and meet the basic needs of the child. The child has been in his current foster home since May of 2010, is bonded with the foster parents and siblings, and has told the workers that he is happy with his family the way it is now. As the court found, "[t]he child is placed in [a] stable setting where the child's needs are being met." Point III is denied.

The judgment is affirmed.

GARY W. LYNCH, P.J., WILLIAM W. FRANCIS, JR., J., concur.